UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOGTALE, LTD., <br><br> Plaintiff, <br><br> v. <br><br> IKOR, INC., et al., <br><br> Defendants. | Case No. 11-cv-05452-EDL <br><br> **ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON DEFENDANTS' COUNTERCLAIM** <br><br> Re: Dkt. No. 251 |

On December 19, 2014, Plaintiff filed this motion for summary judgment on Defendants' counterclaim. For the reasons set forth below, Plaintiff's motion is GRANTED.

**I.  FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

In 2006, the Parties began negotiations regarding a potential investment by Plaintiff in Defendant IKOR, Inc. On August 21, 2006, the Parties entered into a memorandum of understanding ("MOU") that expresses Plaintiff's "interest in investing in the Company" and intent to "purchase . . . approximately 25% of the Company's equity . . . for US$5 million." (Morneau Decl. Ex. 2 (MOU) at 2.) The MOU states that Plaintiff will be "given with this equity investment . . . the right of first refusal for an exclusive option to acquire all rights relating to the Company's products in Asia" and the right "to participate as an investor in future investments of the Company in USA and Europe (the geographical area of which is to be agreed)." (Id.) The MOU further states that the details are to be "negotiated" and will be "set out in [a] formal agreement." (Id.)

On October 20, 2006, Plaintiff invested $5 million in Defendant IKOR and executed a Series A Preferred Stock Purchase Agreement ("Purchasing Agreement"). (Id. Ex. 9.) One of the conditions of the Purchasing Agreement was the execution of an Option Agreement. (Id. Ex. 10

(Option Agreement) at 1 ("A condition to [Plaintiff's] obligations under the Purchasing Agreement is that [Defendant IKOR] and [Plaintiff] enter into this Agreement for the purpose of setting forth the terms and conditions pursuant to which [Defendant IKOR] grants [Plaintiff] certain options in relation to the research, development, manufacture, sale, marketing and distribution of certain products.").) The Option Agreement states that:

> In consideration of the sum of HK$1.00 now paid by [Plaintiff] to [Defendant IKOR] . . . [Defendant IKOR] hereby irrevocably and unconditionally grants to [Plaintiff] the option (the "Option") to require [Defendant IKOR] to enter into a license and manufacturing agreement (the "License and Manufacturing Agreement") with [Plaintiff] . . . on the principal terms set out in the Schedule hereto.
>
> The Option may be exercised by [Plaintiff] at any time during the period-commencing from the date of this Agreement to the first anniversary hereof by serving an option notice in the form attached hereto as Exhibit A (the "Option Notice") on [Defendant IKOR] upon which the Option shall be deemed exercised.
>
> Immediately after the service of the Option Notice, [Defendant IKOR] and [Plaintiff] shall negotiate diligently and in good faith, and use their best efforts to enter into the License and Manufacturing Agreement on the principal terms and conditions set out in the Schedule attached hereto within thirty (30) days after such service. [Defendant IKOR] and [Plaintiff] hereby agree that if they fail to enter into the License and Manufacturing Agreement within the aforesaid period of time, they shall submit any points of disagreement to binding arbitration pursuant to Section 2.1.

(Id.)

Attached to the Option Agreement is a document labeled "Schedule" and "Term Sheet" that includes a "License and Manufacturing Agreement'' ("LMA") and the Option Notice. The LMA states that:

> Upon the exercise of the Option of [Plaintiff], [Plaintiff] and [Defendant] IKOR shall enter into a License and Manufacturing Agreement ("Agreement") under which [Plaintiff] would be granted (i) an exclusive right (subject to the limitations described below) to establish and maintain manufacturing facilities for manufacturing the Licensed Products in the Territory and to research, develop, manufacture, commercialize, market, sell and distribute the Licensed products in the Territory; and (ii) a right to research and develop and co-exclusive right solely with [Defendant] IKOR (subject to the limitations described below) to manufacture the Licensed Products for sale in the Extended Territory, all subject to the proposed terms and conditions described below.

(Id. at 5.) The document defines "Licensed Product" as:

2

> Any product, the research, development, manufacture, use, sale, offer for sale, import or export of which, but for the license granted in the Agreement, would infringe an issued valid claim in any IKOR Patent Rights in any county at the time of the infringing activity in that county.

(Id.) Although some sections of this document suggest that their precise terms still need to be negotiated, these unresolved terms were never finalized. (Id. Ex. 72 (Canton Dep.) at 393, 428-31.)

In April 2007, the Parties were still discussing "details" that needed to be "worked out . . . and agreed . . . and incorporated into the Licence and Manufacturing Agreement to be entered when [the] option is exercised pursuant to [the] Option Agreement." (Wai Decl. Ex. 4 at 3.) In June 2007, Plaintiff sent a proposed draft of the LMA to Defendant IKOR. (Id. Exs. 9-10.) On August 27, 2007, Defendant Canton told Plaintiff that Defendants were still considering their proposed LMA. (Id. Ex. 11 (E-mail from Defendant Canton to Mr. Wai stating that "I have my lawyers getting back to me on the licensing agreement, they have not been as attentive to this as I would like so I am moving them ahead").) On September 28, 2007, Plaintiff claims that it sent its Option Notice to Defendant, which required the Parties to finalize the LMA within 30 days. (Id. Ex. 9 at 2 (E-mail from Mr. Sien of Plaintiff to Defendant Canton stating that Plaintiff "served the option notice to IKOR Inc." on September 28, 2007); contra Morneau Decl. Ex. 72 (Canton Dep.) at 391 (testifying that this notice was never served on Defendant IKOR).) On October 27, 2007, Defendants sent Plaintiff a proposed "Collaboration and Licensing Agreement," that included several new provisions. (Wai Decl. Ex. 15.) On February 4, 2008, Plaintiff sent a revised LMA to Defendants. (Id. Ex. 18.) Ultimately, the Parties never agreed to a final version of the LMA. (Morneau Decl. Ex 69 (Wai Dep.) at 194.)

In the Fall of 2009, the Parties corresponded regarding an offer by Defendants to license a veterinary product. (Wai Decl. Ex. 35.) On August 21, 2009, Plaintiff sent Defendant a letter stating that:

> I refer to our telephone conversation on 11th August 2009 (Hong Kong time) as well as your follow up email to me of 17th August. As requested, I set out below some of the matters discussed and the understanding on some of issues reached between you and I as well as my proposals and yours for the way forward. . . . you should treat

3

> the contents of this letter as entirely ''without prejudice'',[1] and you should also treat all matters and proposals set out below as non-binding until and unless the parties concerned are able to formalize matters or any aspects of it by way of subsequent agreement(s) . . . .
>
> I had confirmed to you and would confirm again that [Plaintiff] had always respected [Defendants'] rights under the [LMA,] which for the time being are the terms set out in the Schedule to the Option Agreement dated 20th October 2006 (the "Option Agreement"). [Plaintiff] will continue to respect and abide by the terms of the LMA and any and all agreements entered into between [Defendants] and [Plaintiff] . . . .
>
> In the event that we are able to work out the inclusion of Europe and U.S.A. as additions to the Territory for [Plaintiff] to develop, market, distribute and sell the Licensed Products (as defined in the LMA) including OC99 as a veterinary product, such will have to be included in the formal License and Manufacturing Agreement which [Defendant IKOR] and [Plaintiff] would still need to do to formalize and elaborate on matters set out in the existing LMA as contained in the Schedule to the Option Agreement. This is needed for the better co-operation amongst the parties from an operational point of view. I would therefore appreciate if you will revert to me on matters mentioned above so that I can get the lawyers to revise the next draft of the formal and expanded version of the LMA for further distribution to [Defendant IKOR] for comments.

(Id. Ex. 34.)

Subsequently, in September 2009, the Parties exchanged offers for licensing this product in Asia, Europe and the United States. (Id. Exs. 35-38, 41-43.) Plaintiff's offer "insisted on the condition" that the Parties "sign an LMA." (Id. Ex. 45.) Thus, on November 3, 2009, Plaintiff sent Defendants a draft LMA that states that:

> By an option agreement dated 20 October 2006 ("Option Agreement"), [Plaintiff] has been granted an option by [Defendant IKOR] (the "Option") to enter into a license and manufacturing agreement according to the terms stipulated in the Option Agreement. [Plaintiff] by notice dated 28 September 2007 exercised the Option and hereby nominates [Plaintiff] as its nominee to enter into this Agreement. . . . [Defendant IKOR] and [Plaintiff] wish to further develop, manufacture and commercialize the Products.

---

[1] Plaintiff claims that Mr. Wai's use of the term "without prejudice" in his e-mails indicates that he did not intend to be bound by the LMA, arguing that, under Hong Kong Law, the term indicates "an express or implied agreement of the parties that communications are not admissible as evidence and cannot be used for any purpose." (Mot. at 8 n.3.) Defendants move to strike this reference to Hong Kong law, arguing that "[t]here is no evidence supporting this statement . . . California law [applies here] and . . . what [Mr.] Wai 'intended' is not what [Defendant] Canton understood." (Opp. at 16.) However, the Court need not decide this question because, as discussed below, Defendants raise a genuine issue of material fact over whether the Parties intended to be bound by the LMA.

4

> Accordingly, [Defendant IKOR] desires to grant to [Plaintiff], and [Plaintiff] desires to obtain from [Defendant IKOR], exclusive rights, licenses and sub-license rights pertaining to the Territory, all subject to the terms and conditions set forth hereinbelow.

(Id. Ex. 46.) Defendants responded to this draft on November 4, 2009, indicating that they would be providing "many edits." (Id. Ex. 50.) Defendants also outlined "a few deal making or breaking issues," including that the "license is exclusively for the [European Medicines Agency ("EMEA")] territory and only for the veterinary market in the EMEA." (Id.)

On November 5, 2009, Plaintiff responded, indicating that:

> From day one of our discussions, the world has been divided into 3 economic regions: Asia . . . U.S. (comprising North and South America) and Europe (comprising all countries except the countries of Asia and U.S.). We have no interest in piecemeal rights being negotiated. This is the definition I have all along presented to my shareholders. If there is any change on your part from our previous agreement, we will not be proceeding any further, as separate territory control and economics do not make good business sense.

(Id.) On November 7, 2009, Defendants responded that "we cannot come to terms so the offer for selling you any further rights is terminated and final." (Id. Ex. 49.)

On November 11, 2011, Plaintiff filed this action. Plaintiff alleges claims for: (1) injunctive relief; (2) breach of an Investors' Rights Agreement; (3) breach of fiduciary duty; and (4) breach of the implied covenant of good faith and fair dealing. On January 2, 2013, Defendants filed their second amended counterclaims, alleging: (1) breach of the LMA; (2) theft of intellectual property; and (3) interference with prospective business opportunity. On August 14, 2013, the Court dismissed Defendants' second and third counterclaims with prejudice. Plaintiff now moves for summary judgment on Defendants' remaining counterclaim for breach of the LMA.

**II.    STANDARD**

Summary judgment shall be granted if "the pleadings, discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(c). Material facts are those which may affect the outcome of the case. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. Id. The court must view the facts in

5

the light most favorable to the non-moving party and give it the benefit of all reasonable inferences to be drawn from those facts. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The court must not weigh the evidence or determine the truth of the matter, but only determine whether there is a genuine issue for trial. Balint v. Carson City, 180 F.3d 1047, 1054 (9th Cir. 1999).

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. On an issue where the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the nonmoving party's case. Id. If the moving party meets its initial burden, the opposing party "may not rely merely on allegations or denials in its own pleading;" rather, it must set forth "specific facts showing a genuine issue for trial." See Fed. R. Civ. P. 56(e)(2); Anderson, 477 U.S. at 250. If the nonmoving party fails to show that there is a genuine issue for trial, "the moving party is entitled to judgment as a matter of law." Celotex, 477 U.S. at 323.

### III. DISCUSSION

A breach of contract claim requires: "'(1) the existence of [a] contract; (2) plaintiff's performance or excuse of nonperformance; (3) defendant's breach; and (4) damages to plaintiff as a result of the breach.'" Gutierrez v. State Farm Ins. Co., 2013 WL 2403651, at *5 (N.D. Cal. May 31, 2013) (Grewal, J.) (CDF Firefighters v. Moldonado, 158 Cal. App.4 th 1226, 1239 (2008)). In order for a contract to exist, there must be mutual assent. Rennick v. O.P.T.I.O.N. Care, Inc., 77 F.3d 309, 315 (9th Cir. 1996) ("It is a basic tenet of contract law that creation of a valid contract requires mutual assent."). Furthermore, "California law is clear that there is no contract until there has been a meeting of the minds on all material points, despite the fact some terms have been agreed orally, or some action has been taken." Grove v. Grove Valve & Regulator Co., 4 Cal. App. 3d 299, 312 (1970); S.J. Amoroso Const. Co. v. Executive Risk

Indem., Inc., 2009 WL 4907736, at *7 (N.D. Cal. Dec. 14, 2009) (Armstrong, J.). Thus, "[w]here any of the terms are left for future determination or there is a manifest intention that the formal agreement is not to be complete until reduced to a formal writing to be executed, there is no binding contract until this is done." Smissaert v. Chiodo, 163 Cal. App. 2d 827, 830-31 (1958); First Nat. Mortgage Co. v. Fed. Realty Inv. Trust, 631 F.3d 1058, 1065 (9th Cir. 2011) ("an 'agreement to agree,' without more, is not a binding contract." (quoting Autry v. Republic Prods., 30 Cal. 2d 144, 151-52 (1947))); Stoehr v. UBS Sec., LLC, 2008 WL 2705575, at *3 (N.D. Cal. July 10, 2008) (Conti, J.) (dismissing a breach of contract claim where the alleged contract included conditional language that evidenced an intent to be bound by a future contract); Goodworth Holdings Inc. v. Suh, 239 F. Supp. 2d 947, 957 (N.D. Cal. 2002), aff'd, 99 F. App'x 806 (9th Cir. 2004) (finding that a term sheet did not create a binding contract between the Parties despite allegations that the Parties "orally agreed to certain essential terms" because the Parties' "preliminary agreements were mere preliminary negotiations that may or may not have wound up leading to a final offer.").[2] Here, even if the parties intended to be bound by the October 20, 2006 LMA, there is no genuine issue of material fact that the Parties never entered into a valid contract.

Defendants allege that Plaintiff breached the LMA by failing to pay them royalties and by "marketing and manufacturing . . . IKOR's Oxygen Therapeutics and related pharmaceuticals." (Dkt. 45 (Defendants' Second Amended Answer and Counterclaim to First Amended Complaint) at 21, 24-25.) Although Defendants acknowledge that "a more complete agreement . . . was never executed" (id.), they argue that Mr. Wai, on behalf of Plaintiff, and Defendant Canton orally agreed to "honor and abide by the October 20, 2006 LMA." (Opp. at 9; see also Morneau Decl. Ex. 72 (Canton Dep.) at 285-86; Opp. at 10 n.3 ("IKOR does *not* claim . . . that there is an 'oral agreement' in place. There is a *written* agreement, confirmed in writing, and verbally, by [Mr. Wai of Plaintiff.]" (emphasis in original)).) Defendants also point to sixteen e-mails that they

---

[2] Defendants argue that where a fiduciary relationship exists, a lesser standard applies, citing Boyd v. Bevilacqua, 247 Cal. App. 2d 272 (1966). Here, however, the Parties did not have a fiduciary relationship, and even assuming arguendo that they did, Boyd is distinguishable as it involved the creation of a joint venture.

7

claim confirm the existence of this agreement.[3] For example, on July 27, 2009, Mr. Wai wrote a letter to Defendant IKOR's board of directors regarding "the rollout of [Defendant] IKOR's manufacturing facility in Aberdeen, South Dakota" that states that:

> [Defendant IKOR] seems to have overlooked the licensing agreements between our companies. According to the Option Agreement dated 20 October 2006, [Defendant] IKOR may set up manufacturing facilities in places other than in the licensed territories only after [Plaintiff's] right of first refusal to invest in any such manufacturing facilities, either on its own, or together with [Defendant] IKOR and other third party in such proportion as [Plaintiff] may deem appropriate.

(Canton Decl. Ex. G at 1.)[4] This letter supports Defendants' argument that Plaintiff believed that the LMA was binding. Similarly, a July 30, 2009 letter from Mr. Wai to Defendant Canton states that Plaintiff "has been performing its responsibilities in accordance with the licensing agreement under the Option Agreement dated 20 October 2006" even though Defendant "IKOR unilaterally and without any reason[] stopped paying and rendering the necessary support to execute validation and preclinical programs." (Canton Decl. Ex. H at 1.) Furthermore, apparently in response to an e-mail from Dr. Canton claiming that Plaintiff was in breach of their agreement, Mr. Wai stated on October 7, 2009 that:

> I fail to see any breach of the license on our part as you alleged . . . . So far, you have not referred us to any *specific provisions* of the license agreement which we have breached as alleged . . . . Please refer us to the relevant provisions of the license agreement where the requirement as you suggested is stated . . . . We are unclear as to the nature of your allegations with respect to the license agreement . . . .

---

[3] Although Plaintiff objects to the admissibility of some of these e-mails (see Reply at 11 n.9), the Court does not decide this issue because, even considering these e-mails, the Court grants Plaintiff's motion.

[4] Plaintiff moves to strike Defendant Canton's declaration, arguing that it "does not set forth facts within the declarant's personal knowledge and instead consists of conclusions, arguments, hearsay and unsupported conjecture." (Reply at 2.) Plaintiff also argues that the declaration contradicts Defendant Canton's deposition testimony. (Reply at 3 (citing a myriad of exhibits).) While Plaintiff has not shown any contradiction, Plaintiff is correct that Defendant Canton's declaration improperly includes numerous pages of argument, legal conclusions, and assertions not within the declarant's personal knowledge and in violation of Local Rule 7-5(b). Therefore, the Court GRANTS Plaintiff's request to strike the Canton declaration. See Universal Grading Serv. v. eBay, Inc., 2011 WL 846060, at *11 (N.D. Cal. Mar. 8, 2011) (Whyte, J.) ("Because [Plaintiffs'] Declaration contains numerous legal conclusions and arguments and lacks proper foundation, this court grants [Defendant's] motion to strike."). Plaintiff also challenges the admissibility of several exhibits that Defendant Canton attaches. As with the e-mails mentioned above, the Court does not decide this issue because even considering these exhibits, the Court grants Plaintiff's motion.

> It is stated in the license agreement [that] "IIKOR shall have a standard right to inspect the manufacturing facility at the time it commences operations[]". Please describe the elements of the license agreement by detailing the elements that are not being met and given that you have request no inspection."

(Canton Decl. Ex. O at 1 (emphasis in original).)  Also, there is evidence that suggests that Defendants considered the LMA to be binding.  For example, a December 29, 2009 e-mail sent by Defendant Canton shows elation ("[t]his is a Christmas present of large proportions") after Plaintiff failed to respond to an order request sent by Defendants, which, according to Defendant Canton, "nullified [Plaintiff's] first right option to provide product[s] to [Defendant] IKOR . . . . and sets the stage for [Defendant] IKOR contracting internally or to other parties."  (Morneau Decl. Ex. 54 at 1.)

In response, Plaintiff argues that other evidence demonstrates that the Parties did not have an intent to be bound by the LMA.  For example, Mr. Wai states that although he

> told [Defendant Canton] that [Plaintiff] would for the time being respect the principal terms outlined in the Schedule to the Option Agreement until such time that a formal agreement could be reached[,] [i]t was never my intention or expectation that the Schedule would act as an LMA or that Logtale would be contractually bound to those terms unless they were included in a formal, written LMA approved and signed by both parties.

(Wai Decl. ¶ 4.)  Plaintiff also cites the exchange of numerous drafts of the LMA between the Parties.  (See, e.g., id. Exs. 9-11.)  Furthermore, Plaintiff notes that several provisions of the LMA indicated that negotiations were to come.  For example, the LMA begins by stating that "[u]pon the exercise of the option of [Plaintiff], [Plaintiff] and [Defendant] IKOR shall enter into a License and Manufacturing Agreement . . . under which [Plaintiff] would be granted . . ." certain rights.  (Morneau Decl. Ex. 10 at 5.)  This conditional language suggests that the agreement is not final.  In addition, other provisions of the agreement explicitly state that their terms are "subject to future discussion between the Parties" or that they will "be negotiated as part of the definitive Agreement."  (Id. at 8, 11.)  Nevertheless, Defendant Canton's testimony that he and Mr. Wai reached an oral agreement to abide by the terms of the LMA, combined with the e-mails referencing the LMA's binding effect, would suffice to create a genuine issue of material fact over whether the Parties intended to be bound by the LMA.

9

Intent to be bound alone, however, is insufficient; a valid contract also requires a "meeting of the minds on all material points." S.J. Amoroso Const. Co., 2009 WL 4907736, at *7. Goodworth Holdings Inc. v. Suh, 239 F. Supp. 2d 947 (N.D. Cal. 2002), aff'd, 99 F. App'x 806 (9th Cir. 2004), is particularly instructive here. That case granted a motion for summary judgment pertaining to an oral agreement to create a joint venture where the parties allegedly "agreed that they would pay their own expenses, each would have a 50-50 stake, each would like to receive twenty percent of the equity acquired, and the parties were not allowed to work with anyone else." 39 F. Supp. 2d at 956. There was also a term sheet that indicated that "the division of profits, who the parties to the agreement would be, and what role each party would play in the transaction was not determined." Id. at 957. Additionally, some of the Parties' names were listed in the term sheet in brackets. Id. After noting that "[a] legally binding agreement . . . is not formed where essential elements are reserved for future agreement," id. at 956, the court held that no contract had been formed, reasoning that the term sheet's unresolved issues "alone [are] dispositive," id. at 957.

Here, there is no dispute as to those terms that were set out in the October 20, 2006 LMA. (Opp. at 9; Morneau Decl. Ex. 72 (Canton Dep.) at 284-86, 309-11, 385.) However, there are several material terms explicitly left unresolved by the LMA:

> Sale in Extended Territory: In respect of the Licensed Products manufactured by the Licensee for sale in the Extended Territory, the Licensee will sell such products to such party or parties as may be designated by IKOR at a price equal to a minimum of twenty percent (20%) plus Costs of Goods Sold (as defined above), *with such amount to be subject to future discussion between the Parties.*
>
> New Intellectual Property: The Licensee will own all new intellectual property related to a Licensed Product that is conceived or reduced to practice by the Licensee during the term of the Agreement. Upon IKOR's request, the Licensee will grant a royalty-bearing non-exclusive licensee of such new intellectual property to IKOR *on terms to be agreed between the Parties.*
>
> Termination: Either Party would have the right to terminate the Agreement for uncured material breach upon ninety (90) days prior written notice to the other Party. *Other typical grounds for termination would be included. The effects of any such termination by either Party would be negotiated as part of the definitive Agreement.*

(Morneau Decl. Ex. 10 at 8-11 (emphasis added).)

Plaintiff also notes ambiguities in the LMA as to other material points that are not resolved by the document. For example, the section defining the "term" of the agreement states:

> The term of the Agreement will continue on a product-by-product basis with respect to each country in the Territory until the later of (i) the last to expire of the applicable IKOR Patent Rights with valid claims covering a Licensed Product(s) in such country expires, and (ii) ten years after the first commercial sale of that particular Licensed Product in such a country.

(Id. at 10.) This section is ambiguous in the context of this case as the "licensed products" were still being developed. Therefore, whether Plaintiff breached the LMA by failing to spend a minimum of $10,000,000 over the course of the agreement, as Defendants claim (see Morneau Decl. Ex. 10 at 9), is unclear because Plaintiffs would not be in breach of this section if the term of the agreement were still ongoing. Furthermore, the effect of a breach of the LMA is also unclear as the termination section merely specifies that "typical grounds" will be included. (Id. at 11.) Additionally, Defendants argue that they "made several demands to inspect [Plaintiff's] facilities, but such demands have been ignored or refused." (Dkt. 45 at 24.) However, the LMA only specifies that Defendant IKOR will have "standard rights" to inspect the facility. It is unclear what those rights actually are. Therefore, Defendants are mistaken in claiming that "only two (2) things [were] left to be determined" with this agreement. (Opp. at 22.)

Defendants also argue that the LMA is not a mere "agreement to make an agreement" because extensive negotiations went into the drafting of the document (see Canton Decl. Exs. DD, EE (pre-October 20, 2006 LMA drafts)), and a February 2008 draft LMA circulated by Plaintiff incorporates the October 20, 2006 LMA (see Wai Decl. Ex. 18). However, these ongoing negotiations belie the existence of a final agreement on all material terms. For example, Plaintiffs' February 2008 draft of the LMA (Wai Decl. Ex. 18), as well as several of the other drafts circulated by the Parties, contains numerous additional terms not included in the October 20, 2006 LMA.[5] Defendants characterize these negotiations as "materially and significantly new and

---

[5] Defendants' argument that the February 2008 draft of the LMA incorporates the October 20, 2006 LMA as an exhibit is not to the contrary. (Opp. at 25.) The issue here is not whether Plaintiff was following the October 20, 2006 LMA. For a time, Plaintiff admits that it was.

different than the October 20, 2006 LMA," apparently in an attempt to argue that the Parties' continued negotiations pertained to a separate agreement. (Opp. at 11.) However, there is no support in the record for this assertion other than the improper declaration from Defendant Canton. See Celotex, 477 U.S. at 323-24 ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses."). The October 20, 2006 LMA is written in conditional language that indicates that the document is not a final agreement. (See Morneau Ex. 10 at 5-11; see also Ex. 10 at 1 (Option Agreement) (specifying that the Parties "*shall negotiate* diligently and in good faith, and use their best efforts to enter into the License and Manufacturing Agreement on the principal terms and conditions set out in the Schedule" (emphasis added)).) Furthermore, subsequent drafts clarify certain terms which were left ambiguous by the October 20, 2006 LMA, such as the representations and warranties of the Parties, and the effect of termination, showing that the Parties were continuing to negotiate the LMA's terms. Ultimately, the Parties were not actually able to reach an agreement. Thus, while there may be a genuine issue of material fact over whether the parties intended to be bound by the LMA, the undisputed facts show that the Parties failed to reach a "meeting of the minds on all material points." S.J. Amoroso Const. Co., 2009 WL 4907736, at *7; Goodworth Holdings, 39 F. Supp. 2d at 957.

## IV. CONCLUSION

Plaintiff's motion for summary judgment on Defendant's counterclaim for breach of the LMA is GRANTED.

**IT IS SO ORDERED.**

Dated: March 20, 2015

_____
Elizabeth D. Laporte
United States Magistrate Judge

---

(Reply at 11 ("the evidence . . . only shows Plaintiffs willingness to temporarily abide by the terms of the Schedule (such as they were) until an agreement could be reached on the actual material terms that had been left to future determination, which never occurred").) Rather, the issue is whether there was an agreement on all material terms sufficient for the October 20, 2006 LMA to be a binding contract.